IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANCIS JOHN DURKEY, | ) | Civil Action No. 17-317 |
| | ) | |
| Plaintiff | ) | District Judge David S. Cercone |
| | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| PACIFIC LIFE INSURANCE | ) | |
| COMPANY, *et al*., | ) | |
| | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

I. **RECOMMENDATION**

It is respectfully recommended that the Motions to Dismiss filed by Defendants Pacific Life Insurance Company ("Pacific Life") (ECF No. 5) and Irwin A. Klein ("Klein") (ECF No. 13) be granted in part and denied in part, as more fully explained below.

II. **REPORT**

A. **Factual Background**

In the fall of 2000, Plaintiff Francis John Durkey (hereinafter "Plaintiff"), a long-time client of Pacific Life, sought to increase the amount of his existing life insurance coverage. (Compl., ECF No. 1 ¶¶ 90-92). Plaintiff approached Klein, a licensed insurance salesperson and authorized representative of Pacific Life, and provided him with information concerning his financial status, existing life-insurance coverage, and insurance and financial goals. (*Id*. ¶¶ 5, 92, 98). As an inexperienced investor with "little or no knowledge of the complexities of life insurance, annuities or investment products," Plaintiff relied on Klein's expertise to help him select the appropriate life insurance product. (*Id*. ¶¶ 93-100). Based on the information provided

by Plaintiff, Klein advised that it would be "both beneficial to Plaintiff, and in Plaintiff's best interest, to purchase a life insurance policy." (*Id.* ¶ 100).

The particular policy recommended by Klein was a Pacific Select Exec II Flexible Premium Variable Life Insurance Policy with a face value of $75,000.00. (*Id.* ¶ 102). Klein explained that the quarterly scheduled premium for that policy would always be $754.00, and that if Plaintiff made those payments for the term of the policy, then the $75,000.00 death benefit would remain available for his beneficiaries until the year of his 120th birthday. (*Id.* ¶¶ 104, 106). Based on Klein's representations, Plaintiff signed an application to purchase the recommended policy on December 27, 2000. (*Id.* ¶ 114). The policy was issued on February 5, 2001, bearing policy number VP6122844-0, and Plaintiff begin making his scheduled quarterly payments. (*Id.* ¶ 115, 118).

On August 5, 2014, Plaintiff noticed that his latest account statement for policy number VP6122844-0 showed a decrease in the cash value of the policy from $12,082.78 to $12,040.95. (*Id.* ¶ 119-120). Subsequent account statements continued to reflect that the cash value of the policy was decreasing. (*Id.* ¶¶ 123, 126, 129, 132, 134). Because of his concerns about the decreasing cash value of the policy, Plaintiff surrendered the policy for the remaining accumulated cash value of $10,156.10 on December 4, 2015. (*Id.* ¶¶ 135-37). Plaintiff received a check in that amount on December 7, 2015, at which point he was 90 years old and had paid $45,586.00 into the policy. (*Id.* ¶¶ 137-38).

Plaintiff initiated this civil action in the Court of Common Pleas of Allegheny County, Pennsylvania, on February 6, 2017. (Notice of Removal, ECF No. 1). On March 10, 2017, Defendants removed this action to the United States District Court for the Western District of Pennsylvania. (*Id.*). Plaintiff's Complaint asserts five separate causes of action against Pacific

Life: negligent misrepresentation (Count I); fraudulent misrepresentation (Count II); violation of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III); breach of fiduciary duty (Count IV); and negligent supervision (Count V). (*Id.*). Klein is named as a Defendant with respect to Counts I through IV.

On March 31, 2017, Pacific Life moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 5) and filed a Memorandum of Law in support thereof (ECF No. 6). Plaintiff filed a response in opposition (ECF No. 10) and a brief in support thereof (ECF No. 11).

On May 3, 2017, Klein filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No 13) and a motion to join Pacific Life's motion to dismiss (ECF No. 15). Klein also filed a brief in support of his motion to dismiss wherein he incorporated the arguments and supporting case law set forth in Pacific Life's motion. (ECF No. 14). On May 4, 2017, the undersigned granted Klein's motion to join in Pacific Life's motion to dismiss. (ECF No. 16). Shortly thereafter, Plaintiff filed a response in opposition (ECF No. 17) and a brief in support thereof (ECF No. 18). These motions are now ripe for disposition.

### B. <u>Legal Standards</u>

Defendants have moved to dismiss the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993). A complaint must be dismissed for failure to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45-46

(1957)); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Twombly,* 550 U.S. 544 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 556).  The Supreme Court further explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly,* 550 U.S. at 556-57).  The Third Circuit has expounded on this standard in light of its decision in *Phillips v. County of Allegheny,* 515 F.3d 224 (3d Cir. 2008) (construing *Twombly* in a civil rights context), and the Supreme Court's recent decision in *Iqbal*:

> After *Iqbal,* it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1948.  The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 1949-50; *see also Twombly,* 505 U.S. at 555, & n. 3.

*Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009).

Courts generally consider only the allegations of the complaint, attached exhibits, and matters of public record in deciding motions to dismiss.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir. 1993) (citations omitted).  Factual allegations within documents described or identified in the complaint may also be considered if the plaintiff's claims are based upon those documents.  *Id.* A district court may consider these

documents without converting a motion to dismiss into a motion for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

### C.    Discussion

#### 1.    Negligent Misrepresentation (Count I)

In his first cause of action, Plaintiff asserts that Klein negligently misrepresented the terms of Pacific Life policy number VP6122844-0 in order to persuade him to purchase that policy.  Defendant counters that Plaintiff's negligence-based claims are barred by the economic loss doctrine.

Pennsylvania's economic loss doctrine generally provides that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." *Azur v. Chase Bank, USA*, 601 F.3d 212, 222-23 (3d Cir. 2010) (quoting *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008)).  *See also Elliott-Lewis Corp. v. Skanska USA Building, Inc.*, No. 14-3865, 2016 WL 2346737, at *3 (E.D. Pa. May 4, 2016) ("Pennsylvania common law generally bars negligence claims that result solely in economic loss.").  A narrow exception to this general rule exists, however, with respect to "cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons." *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 285 (Pa. 2005).  This exception stems from Section 552 of the Restatement (Second) of Torts which states in pertinent part:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable

reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1).

In *Bilt-Rite*, the defendant, an architect, supplied designs and specifications to be used by contractors in preparing bids for a construction project. *Bilt-Rite*, 866 A.2d at 272. The designs indicated that certain portions of the project could be installed and constructed "through the use of normal and reasonable construction means and methods, using standard construction design tables." *Id*. Once the project commenced, however, the winning bidder discovered that the work required special construction methods "resulting in substantially increased construction costs." *Id*.

Bilt-Rite sued, arguing that it had justifiably relied on the architect's misrepresentations in crafting its winning bid. *Id*. The defendant responded that such claims were barred by the economic loss doctrine. *Id*. at 272-73. The Pennsylvania Supreme Court sided with the plaintiff, holding that Section 552 "sets forth the parameters of a duty owed when one supplies information to others, for one's pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities." *Id*. at 285-86. The Court reasoned that the economic loss doctrine did not preclude claims that fall within the Section 552 exception because "economic losses are routinely allowed in tort actions in other contexts such as legal malpractice, accountant malpractice, and architect liability." *Id*. at 278-88.

The Pennsylvania Supreme Court's plurality decision in *Rempel v. Nationwide Life Insurance Co., Inc.*, 370 A.2d 366 (1977), is also instructive. In *Rempel*, the plaintiff's husband sought information from his insurance agent as to whether he could add a whole life policy to his existing mortgage protection policy. *Id*. at 367. After consulting with Nationwide, the agent sold the Rempels a policy that the agent claimed would pay the remainder of their mortgage

balance, plus $5,000 in life insurance, upon Mr. Rempel's death.  *Id*.  When Mr. Rempel died, his wife discovered that the terms of the policy did not, in fact, contain those provisions.  *Id*.  She sued Nationwide and the insurance agent on a theory of negligent misrepresentation.  *Id*.

Citing Section 552, the Pennsylvania Supreme Court affirmed the trial court's decision to allow the negligent misrepresentation claim to go to the jury.  *Id*.  The Court noted that "[c]onsumers, such as the [plaintiffs], view an insurance agent . . . as one possessing expertise in a complicated subject.  It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself."  *Id*. at 368.  Because there was "no evidence . . . indicating that the [plaintiffs] knew, or should have known, that the policy which they received did not contain the provisions which [the agent] led them to believe would be in the policy," the plaintiffs' negligent misrepresentation claim based on the whole life policy was sustained.  *Id*. at 369.

The Pennsylvania Supreme Court did not explicitly address the economic loss doctrine in *Rempel*.  However, *Rempel's* reliance on Section 552 to sustain a claim for negligent misrepresentation in the insurance sales context is consistent with the Court's subsequent adoption of Section 552 as a narrow exception to the economic loss doctrine.  Indeed, the Pennsylvania Supreme Court discussed *Rempel* with approval in the course of adopting Section 552 as the law in Pennsylvania in *Bilt-Rite*.  *Bilt-Rite*, 866 A.2d at 469-70 (noting that *Rempel* had relied on Section 552 without adopting it).

Some courts have read *Bilt-Rite* as applying "to only those negligent misrepresentation claims involving architects and similar design professionals."  *Hults v. Allstate Septic Sys., LLP*, No 06-541, 2007 WL 2253509, at *9 (M.D. Pa. Aug. 3, 2007) (citing *Rock v. Voshell*, No. 05-1468, 2005 WL 3557841, at *1 (E.D. Pa. Dec. 29, 2005)).  Others have held that *Bilt-Rite* applies

to any entity "in the **business of providing information**." *Slippery Rock Area Sch. Dist. v. Tremco, Inc.*, No. 15-1020, 2016 WL 3198122, at *14 (W.D. Pa. June 9, 2016) (emphasis in original). *See also Elliot-Lewis Corp. v. Skanska USA Bldg., Inc.*, No. 14-3865, 2015 WL 4545362, at *5 (E.D. Pa. July 28, 2015) ("The Court recognizes that Section 552 liability is not limited to design professionals."); *Precision Pipeline, LLC v. Trico Surveying & Mapping, Inc.*, No. 13-1823, 2014 WL 4415378, at *2 (W.D. Pa. Sept. 8, 2014) (applying Section 552 liability to surveying company). In our view, the latter approach is more consistent with the Pennsylvania Supreme Court's explicit recognition that a plaintiff is not barred from recovering economic losses in the context of non-design based actions such as legal and accountant malpractice. *Id*. at 483 (citing *Tommy L. Griffin Plumbing &Heating Co. v. Jordan, Jones & Goulding, Inc*., 463 S.E.2d 85, 88 (S.C. 1995)); *see also Rempel*, 370 A.2d at 367-79 (permitting a negligent misrepresentation claim in the insurance sales context to go to a jury).

Applying the foregoing principles to the instant case, we conclude that Plaintiff's action for negligent misrepresentation is not barred by the economic loss rule. Klein, an experienced insurance agent, was in the business of offering information about Pacific Life's insurance products for his own pecuniary gain. *See* Restatement (Second) of Torts § 552 (rendering liable "[o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions . . ."). As in *Rempel*, Plaintiff relied on the information provided by Klein to determine the type of insurance policy to purchase. This transaction falls squarely within the purview of Section 552 and, as such, the *Bilt-Rite* exception to the economic loss rule applies. Therefore, it is recommended that the Defendants' motion to dismiss as to Count I be denied.

## 2.      Fraudulent Misrepresentation (Count II)

We next consider whether the economic loss doctrine applies to Plaintiff's fraudulent misrepresentation claim. "[I]ntentional misrepresentation claims are generally preempted by the economic loss rule," except where "a defendant committed fraud to induce another to enter a contract." *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F.Supp.2d 643, 658 (E.D. Pa. 2002) (citing *Werwinsky v. Ford Motor Co.*, 286 F.3d 661, 680-81 (3d Cir. 2002)). This is because fraudulent inducement claims are "much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F.Supp.2d 329, 341 (E.D. Pa. 2003). However, "[i]nducement claims remain viable only when a party makes a representation extraneous to the contract . . . [rather than] when the representations concern the subject matter of the contract or the party's performance." *Reilly Foam*, 206 F.Supp.2d at 659.

The Third Circuit Court of Appeals has cited the following example of a representation that would be extraneous to a contract:

> For example, a company might falsely misrepresent its financial condition, or the level of its insurance coverage, in order to induce another company to enter into a contract. Such considerations, while they may be relevant when considering who[m] to do business with, do not concern the underlying subject matter of the contract or a party's performance thereunder.

*Werwinski*, 286 F.3d at 677 (quoting *Rich Prod. Corp. v. Kemutec, Inc.*, 66 F.Supp.2d 937, 977-80 (E.D. Wis. 1999)). On the other hand, a fraudulent misrepresentation is intrinsic to a contract or warranty claim if the misrepresentations concern the specific subject matter of the contract or warranty, such as "the quality or characteristics of the goods sold," *Air Prods.*, 256 F.Supp.2d at

337, or a party's failure to fulfill its obligations under the contract. *See*, *e.g.*, *McGuckin v. Allstate Fire and Cas. Ins. Co.*, 118 F.Supp.3d 716, 721 (E.D. Pa. 2015).

In the instant case, Klein allegedly misrepresented the amount and frequency of the premium payments that were necessary to maintain the cash value of the Pacific Life policy through a certain date. A factually similar scenario was presented in *McGuckin*, wherein the plaintiff alleged that an Allstate agent enticed him to purchase additional, "extraordinary" auto insurance coverage for a premium price by representing that the "medical benefits coverage would pay his or other insureds' benefits when medical bills resulting from a vehicle accident exceeded $100,000." *McGuckin*, 118 F.Supp.3d at 721. After he purchased the policy, the plaintiff sustained over $100,000 in medical bills as the result of a vehicle accident. *Id.* Upon submitting his claim for the extraordinary medical bills, Plaintiff discovered that Allstate and its agent had failed to disclose that the policy contained a "hidden exclusion" requiring that the bills be for "reasonable and necessary" medical expenses, as determined entirely by Allstate. *Id.* Allstate relied on this exclusion to deny his claim and withhold the expected benefits. *Id.*

Plaintiff filed suit, alleging that Allstate and its agent had misrepresented the type of coverage that would be available to him if he sustained a catastrophic vehicle accident. *Id.* Allstate responded that the claim was barred by the economic loss doctrine. *Id.* The court agreed:

> The misrepresentations that McGuckin alleges here . . . relate to the subject matter of the insurance contract and Allstate's performance under it. . . . Allegations that a party did not intend to perform the contract properly "concern the subject matter of the contract of the party's performance" and, thus, do not fit within the limited exception to the economic loss doctrine for fraud in the inducement.

*Id.* at 721-22 (citing *Reilly Foam*, 206 F.Supp.2d at 659).

We reach the same conclusion here. The allegedly fraudulent representations made by Klein relate directly to the terms and conditions of the Pacific Life policy and the parties' expected performance pursuant to that agreement. Such allegations do not fit within the limited exception to the economic loss doctrine for fraud in the inducement. *McGuckin*, 118 F.Supp.3d at 721-22; *see also Whitaker v. Herr Foods, Inc.*, 198 F.Supp.3d 476, 491 (E.D. Pa. 2016) ("Here, Plaintiff's fraudulent misrepresentation claim is intrinsic to the contract and warranty claim because it relates to the quality and characteristics of the products purchased from Defendant. . . . Plaintiff's economic losses are therefore based on and flow from his loss of the benefit of his bargain and his disappointed expectations as to the products he purchased."). It is recommended that Plaintiff's fraudulent inducement claim be dismissed.

### 3.    UTPCPL (Count III)

In Count III, Plaintiff alleges that Klein and Pacific Life's misrepresentations violated the UTPCPL, 73 Pa. Stat. Ann. §§ 2011 *et seq*. Defendants again contend that this claim is barred by the economic loss doctrine.

As a general rule, the economic loss doctrine prohibits plaintiffs from asserting a common law tort action to seek economic losses flowing only from a contract. *See Landau v. Viridian Energy PA LLC*, 223 F.Supp.3d 401, 411 (E.D. Pa. 2016) (citing *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)). In *Werwinski*, the Third Circuit Court of Appeals predicted that the Pennsylvania Supreme Court would also apply the economic loss doctrine to statutory fraud claims, such as those arising under the UTPCPL. *Werwinski*, 286 F.3d at 680. At the time that *Werwinski* was decided, Pennsylvania's appellate courts had yet to address whether the economic loss doctrine applied to UTPCPL claims. Since then, however,

Pennsylvania's appellate courts have universally rejected *Werwinski*. *See*, *e.g.*, *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013) (holding that the economic loss doctrine "does not apply to private actions under the [UTPCPL]"). As explained in *Knight*:

> Our research reveals . . . that our Supreme Court has defined the economic loss doctrine as providing "no cause of action exists for **negligence** that results solely in economic damages unaccompanied by physical injury or property damage." The claims at issue in this case are statutory claims brought pursuant to the UTPCPL, and do not sound in negligence. Therefore, the economic loss doctrine is inapplicable and does not operate as a bar to [the plaintiff's] UTPCPL claims.

*Id*. at 951-52 (emphasis in original) (internal citations and footnote omitted).

District courts in Pennsylvania have split as to whether *Werwinski* remains binding in light of the Superior Court's decision in *Knight*. Several courts have held that *Werwinski's* prediction of the Pennsylvania Supreme Court's ruling on the economic loss doctrine remains binding on the district courts in this circuit until either the Pennsylvania Supreme Court or the Third Circuit rules otherwise. *See*, *e.g.*, *McGuckin*, 118 F.Supp.3d at 720 ("This Court concludes that, when the Third Circuit has predicted how the Pennsylvania Supreme Court will rule on an issue, it is bound by that precedent unless one of those two courts subsequently rules otherwise."); *Whitaker*, 198 F.Supp.3d at 490 (concluding that district courts are bound by the holding in *Werwinski* until such time as the Third Circuit states otherwise); *Gadley v. Ellis*, No. 13-17, 2014 WL 3696209, at *4-5 (W.D. Pa. July 23, 2014) ("In the absence of any further guidance from the Pennsylvania Supreme Court or the Third Circuit, the Court concludes that *Werwinski* is binding and dispositive."). Other courts have held that *Werwinski* "no longer has any vitality" in light of the Pennsylvania Superior Court's ruling that the economic loss doctrine is inapplicable to statutory claims brought under the UTPCPL. *Kantor v. Hiko Energy, LLC*, No. 100 F.Supp.3d 421, 427 (E.D. Pa. 2015); *see also Landau*, 223 F.Supp.3d at 411-415 ("[N]ow

12

that the Superior Court has twice rejected *Werwinski*, I refuse to dismiss the UTPCPL claim on

the basis of the economic loss doctrine . . ."); *Roberts v. NVR, Inc.*, No. 15-489, 2015 WL

3745178, at *5-8 (W.D. Pa. June 15, 2015) (agreeing that *Werwinski* is not binding and, pursuant

to *Knight*, holding that "UTPCPL claims are not barred by the economic loss doctrine.").

In *Landau*, the district court aptly explained the reasoning behind the latter approach:

> After *Werwinski*, unanimous panels of the Superior Court have twice
> refused to apply the economic loss doctrine in UTPCPL cases, first in
> *Knight* and more recently in *Dixon v. Northwestern Mutual*, 146 A.3d
> 780 (Pa. Super. 2016) (Olsen, J.). In *Dixon*, the court cited a decision
> from Judge R. Stanton Wettick, one of Pennsylvania's most respected
> jurists, to the effect that application of the economic loss doctrine to the
> UTPCPL would render the UTPCPL's catch-all provision meaningless.
> *Dixon*, 146 A.3d at 790 (citing *Toth v. Nw. Sav. Bank*, No. GD–12–
> 008014, 2013 WL 8538695, at *16 (Pa. Com. Pl. Mar. 1, 2013)). In
> short, six appellate judges in Pennsylvania and a highly regarded trial
> judge have rejected *Werwinski* as a proper statement of Pennsylvania
> law.
>
>       \*      \*      \*      \*      \*      \*      \*
>
> The rejection of *Werwinski* by Pennsylvania appellate courts counsels a
> further look at the analytical strength of *Werwinski* itself. Preliminarily,
> it is noteworthy that the *Werwinski* court did not have the benefit of any
> Pennsylvania decisions directly addressing the applicability of the
> economic loss doctrine to the UTPCPL. *Robinson* [*v. Jiffy Executive
> Limousine Co.*, 4 F.3d 237, 239-40 (3d Cir. 1993)] implicitly recognizes
> that federal courts make predictions out of necessity: some rule must
> govern every pending case. But when federal judges are forced by
> circumstance to divine a path in the absence of meaningful precedent
> from the state courts, the exercise is by its very nature as much
> speculation as it is prediction, properly subject to re-evaluation in the
> face of new developments. As to the precise issue before it, the panel in
> *Werwinski* was painting on a blank canvas, forced to look to other
> jurisdictions. In light of *Robinson*, that alone should give pause because
> the intermediate appellate courts of Pennsylvania have twice rejected
> *Werwinski*.
>
>       \*      \*      \*      \*      \*      \*      \*
>
> There is certainly wisdom to the proposition that a district judge should
> wait for definitive guidance from the circuit before presuming that a
> decision from the circuit has lost vitality. But such caution comes with a

price. The current divergence between the federal and state courts, specifically referenced by the Superior Court in *Dixon*, 146 A.3d at 790 n.12, means that the outcome of a case is currently a function of forum. This is problematic because the Third Circuit has also cautioned that "in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court [should] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Chamberlain v. Giampapa*, 210 F.3d 154, 158–59 (3d Cir. 2000) (quoting *Guar. Trust Co. v. York*, 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945)). *See also Edelson v. Soricelli*, 610 F.2d 131, 134 (3d Cir. 1979) ("[A] fundamental notion underlying *Erie* is that a federal court sitting in diversity merely provides an impartial forum, not a different set of legal rules."); *Stoner v. Presbyterian Univ. Hosp.*, 609 F.2d 109, 111 (3d Cir. 1979) ("The fortuity of diverse citizenship should not subject a litigant to legal burdens different from those that a state court would impose."). Continued application of *Werwinski* in the face of its universal rejection by Pennsylvania courts raises a serious issue of federalism.

*Landau*, 223 F.Supp.3d at 412-15 (internal footnote omitted).

In *Roberts*, the court identified another factor weighing against the vitality of *Werwinski*:

[N]one of the cases . . . in which the courts concluded that they were "bound" to follow *Werwinski* . . . discussed the additional factor that occurs in a removal situation. That is, even if this matter were as undecided as Defendant contends, Plaintiff filed this case in state court, where *Knight* would govern. *See Benson ex rel. Patterson v. Patterson*, 782 A.2d 553, 555–56 (Pa.Super.2001) (Pennsylvania lower courts must follow the precedential rulings of the Superior Court). To allow Defendant to remove the action to this Court and then argue for application of *Werwinski* "encourages outcome-determinative forum shopping - one of the evils that *Erie* [*R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)] aimed to eliminate." *AIU Insurance Co. v. TIG Insurance Co.*, 934 F.Supp.2d 594, 606 (S.D.N.Y. 2013).

*Roberts*, 2015 WL 3745178, at *7.

We agree with the reasoning of *Landau* and *Roberts*. In light of the Pennsylvania Superior Court's rejection of *Werwinski*, continued adherence to the Third Circuit's prediction concerning a relatively settled issue of state law would encourage outcome-determinative forum shopping and raise serious issues of federalism. *Landau*, 223 F.Supp.3d at 414-15. This is

particularly true in cases (such as this one) that were initially filed in state court and subsequently removed to this forum. Because we conclude that Plaintiff's UTPCPL claims are not barred by the economic loss doctrine, it is recommended that Defendants' motion to dismiss on this basis be denied.

### 4.  Breach of Fiduciary Duty (Count IV)

Count IV of the Complaint attempts to state a claim for breach of fiduciary duty. Under Pennsylvania law, "the purchase of insurance is [typically] considered an arm's-length transaction, in which the insurer incurs no fiduciary duty apart from those that may be defined in the contract for insurance." *Dixon*, 146 A.3d at 787 (quoting *Yenchi v. Ameriprise Financial, Inc.*, 123 A.3d 1071, 1078 (Pa. Super. Ct. 2015), *rev'd*, 161 A.3d 811 (Pa. 2017)). Similarly, "an agent typically does not incur a fiduciary duty by selling a policy to an insured." *Id.* (citing *Commonwealth ex rel. Corbett v. Snyder*, 977 A.2d 28, 46 (Pa. Comm. Ct. 2009)). Rather, in order for a fiduciary duty to arise in the insurance context, "the insurer and/or the agent must have a confidential relationship[1] with the insured." *Id.* (citing *Yenchi*, 123 A.3d at 1080).

The Pennsylvania Supreme Court recently clarified the standard for determining whether a fiduciary relationship exists in the context of an insurance transaction. S*ee Yenchi v. Ameriprise Financial, Inc.*, 161 A.3d 811. In *Yenchi*, the plaintiffs responded to a cold call from a financial advisor by requesting advice as to their "financial stuff." *Id.* at 814. After several meetings, the advisor recommended that they keep their disability insurance policy, review their long-term care coverage, consolidate their debt, cut back on expenses, transfer 401(k) funds into mutual funds, and purchase a whole life insurance policy. *Id.* Based on the advisor's

---

[1] In Pennsylvania, the terms "fiduciary relationship" and "confidential relationship" are used interchangeably. *Stewart v. Hooks*, 94 A.2d 756, 759 (Pa. 1953).

recommendations, the plaintiffs started saving money in an investment certificate, opened an IRA account, and purchased $115,000 in whole life insurance coverage. *Id*. at 814-15. Plaintiffs rejected a subsequent suggestion to increase their life insurance coverage to $300,000.00. *Id*. at 815.

Several years later, an independent portfolio review revealed that the life insurance policy that the plaintiffs had purchased was underfunded and destined to lapse. *Id*. at 815. They also learned that an annuity they had purchased would mature twenty years later than represented by the financial advisor at the time of the purchase. *Id*. Based on these revelations, the plaintiffs filed a lawsuit alleging, *inter alia*, breach of fiduciary duty. *Id.* at 815-16.

The trial court dismissed their breach of fiduciary duty claim, holding that no fiduciary relationship arises between an insurance agent and a policyholder unless the policyholder delegates decision-making control to the insurance agent. *Id*. at 816. The Superior Court reversed, noting that a fiduciary duty can arise in the context of an insurance contract so long as the plaintiffs received "independent, financial planning advice" separate from the insurance policy. *Yenchi*, 123 A.3d at 1078-80. The Court also opined that this determination was ordinarily an issue of fact to be resolved by a jury. *Id*.

On appeal, the Pennsylvania Supreme Court agreed that "[w]here one party [to a financial transaction] lacks the ability to understand the nature and terms of the transaction and simultaneously reposes their complete trust in the other party based upon well-established relationships, the circumstance provides an opportunity for the second party to exercise undue influence over the first and, thus, effectively control the decision-making process to their advantage. *Yenchi*, 161 A.3d at 821. The Pennsylvania Supreme Court disagreed, however, that

"a fiduciary relationship can be established without evidence that decision-making power was effectively ceded to another." *Id*. at 822.  As explained by the Court:

> Fiduciary duties do not arise "merely because one party relies on and pays for the specialized skill of the other party." *eToll, Inc. v. Elias/Savion Advertising, Inc*., 811 A.2d 10, 23 (Pa. Super. 2002).  If this were the law in Pennsylvania, "a fiduciary relationship could arise whenever one party had any marginal greater level of skill and expertise in a particular area than another party." *Id*.; *see generally Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 522 (6th Cir. 1999) ("To hold otherwise would impose fiduciary obligations on the seller of goods or services in the vast multitude of ordinary arm's-length transactions simply on the basis that the seller possessed superior knowledge of the product being sold.").

> The superior knowledge or expertise of a party does not impose a fiduciary duty on that party or otherwise convert an arm's-length transaction into a confidential relationship. In this regard, the analysis is no different in a consumer transaction than in other fiduciary duty cases decided by this Court. "[T]he critical question is whether the relationship goes **beyond** mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side," which results in the effective ceding of control over decision-making by the party whose property is being taken. *eToll, Inc*., 811 A.2d at 23 (emphasis in original) (holding that although an advertising company was a "trusted advisor" to a software developer, no fiduciary relationship existed between the parties) (citing *Basile v. H & R Block*, 777 A.2d 95, 101 (Pa. Super. 2001)). A fiduciary duty may arise in the context of consumer transactions only if one party **cedes decision-making control to the other party**.

> \*        \*        \*        \*        \*        \*        \*        \*

> We decline to modify the law of fiduciary duty to encompass the particular pitfalls involved in the sale of insurance products by commissioned agents or financial advisors to less savvy customers. Moreover, we do not hold that a fiduciary duty cannot arise in a case with facts not present here, but absent evidence that a consumer of financial services and goods cedes control over the decision to purchase, either explicitly or implicitly because of over-mastering or undue influence, no fiduciary relationship arises.

*Id*. at 822-24 (emphasis in original). Because the record suggested that the plaintiffs had not ceded total control over their purchasing decisions to the financial advisor, the Pennsylvania Supreme Court reversed the Superior Court's decision to reinstate the plaintiffs' breach of fiduciary duty claim. *Id*. at 824.

Unlike in *Yenchi*, Plaintiff does allege in the instant case that the Defendants relied on their experience and influence to persuade him to relinquish decision-making authority over his own financial and insurance product purchases. He specifically avers that Defendants "represented to Plaintiff that as advisors and counsels to Plaintiff they would select the insurance or investment products that were most suitable for Plaintiff and in the Plaintiff's best interests" and that he "invested such a high level of trust and confidence in the Defendants as advisors and counselors [that he] delegated the decision to Defendants as to which insurance or investment product was selected and the manner in which the transaction was structured." Compl., ECF No. 1 ¶¶ 180-183. Although sparsely detailed, this allegation is sufficient, at this stage in the proceedings, to proceed to discovery.[2] It is recommended that Defendant's motion to dismiss Plaintiff's breach of fiduciary duty claim be denied.

### 5. Negligent Supervision (Count V)

Plaintiff's final claim alleges that, should it be determined that Klein was acting outside of the scope of his employment at the time that he allegedly misled Plaintiff into purchasing the policy, Pacific Life is liable for the negligent supervision of its employee. A claim for negligent supervision "provides a remedy for injuries to third parties who would otherwise be foreclosed

---

[2] Of course, Plaintiff will ultimately have to adduce factual proof that he was so "overpowered, dominated or unduly influenced [in his] judgment" by the Defendants that he relinquished decision-making authority over his own financial affairs. The Pennsylvania Supreme Court's decision in *Yenchi* suggests that this will be a high hurdle to overcome. *See Yenchi*, 161 A.3d at 823-24 (holding that plaintiffs could not establish the requisite level of control where the evidence suggested that they accepted only some of defendants' financial recommendations).

from recovery under the principal-agent doctrine of *respondeat superior* because the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the principal's business." *Belmont v. MB Investment Partners, Inc.*, 708 F.3d 470, 489 (3d Cir. 2013). To state a claim for negligent supervision, a plaintiff must allege: (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside of the scope of his employment; (2) that is committed on the employer's premises; (3) when the employer knows or has reason to know of the necessity and ability to control the employee. *Sherman v. John Brown Ins. Agency, Inc.*, 38 F.Supp.3d 658, 669 (W.D. Pa. 2014) (citing *Belmont*, 708 F.3d at 487-88).

Defendants first contend that Plaintiff cannot sustain a negligent supervision claim because Klein was an independent contractor rather than an employee. In his Complaint, Plaintiff avers that Klein "was a licensed insurance salesperson and an authorized representative of [Pacific Life]" and that he "was acting within the course and scope of his agency and employment" at all relevant times. (Compl., ECF No. 1 ¶¶ 5-6). However, Klein's contract with Pacific Life characterizes him as an independent contractor:

> [Klein] shall be free to exercise independent judgment as to the time, place, and means of performing all acts under this contract, and the relationship of [Klein] to [Pacific Life] shall be that of an independent contractor. Nothing in this contract shall be construed to create the relationship of employer and employee between [Klein] and [Pacific Life].

(Klein Contract, ECF No. 6-1 at 4).

"The designation of a party in a contract as an independent contractor is not conclusive as to the status of that party as an independent contractor." *Holbrook v. Woodham*, No. 05-304, 2008 WL 4425606, at *18 (W.D. Pa. Sept. 30, 2008) (citing *Rodgers v. P-G Publ'g Co.*, 166 A.2d 544, 546 (Pa. Super. Ct. 1961)). *See also Penn Nat. Ins. v. HNI Corp.*, 482 F.Supp.2d 568,

595-96 (M.D. Pa. 2007) (holding that a contractual agreement "is not determinative of the question whether Haldeman was an independent contractor or employee 'for it is the actual practice between the parties which is crucial.'") (quoting *George v. Nemeth*, 233 A.2d 231, 233 (Pa. 1967)).  Instead, Pennsylvania courts look to the following series of factors to determine whether an individual is an employee or an independent contractor:

> [T]he control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer; and the right to terminate the employment at any time.

*Williams v. Jani-King of Phila., Inc.*, 2016 WL 5111920, at *4 (3d Cir. Sept. 21, 2016) (quoting *Morin v. Brassington*, 871 A.2d 844, 850 (Pa. Super. Ct. 2005)).

Significantly, the independent contractor inquiry "is controlled by the particular facts of each case." *Win & Son, Inc. v. City of Phila.*, 178 F.Supp.3d 234, 243-44 (E.D. Pa. 2016).  Thus, "discovery is often necessary" to determine whether a party is an agent or an independent contractor.  *Behr v. Fed. Home Loan Mortg., Corp.*, No. 14-291, 2015 WL 5123656, at *11 (W.D. Pa. July 29, 2015); *see also Miller v. Cerebain Biotech Corp.*, No 16-3943, 2016 WL 6600009, at *4 (E.D. Pa. Nov. 8, 2016) (declining to resolve the issue of whether an individual was an employee or an independent contractor at the motion to dismiss stage).  We conclude that it would be premature to dismiss Plaintiff's negligent supervision claim on the basis of Klein's employment status without providing Plaintiff with the opportunity to conduct discovery as to this fact-intensive issue.

Defendants next contend that Plaintiff's negligent supervision claim must be dismissed because the Complaint alleges that Klein "was acting within the course and scope of his agency

and employment" with Pacific Life at the time of the alleged misrepresentations. It is true that one of the elements of a claim for negligent supervision is that the employee was acting **outside** of the scope of his employment. *Sherman*, 38 F.Supp.3d at 669. However, Defendants' argument ignores that Plaintiff is pleading his negligent misrepresentation claim in the alternative. *See* Compl., ECF No. 1 ¶¶ 204 ("**Should it be alleged** that the Defendant Agent was acting outside the scope of his employment, Plaintiff submits the following claim for negligent supervision.") (emphasis added). This type of pleading is entirely consistent with the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims or defenses as it has, regardless of consistency"). Indeed, district courts in Pennsylvania have consistently permitted plaintiffs to assert claims of both negligent supervision and direct negligence. *See, e.g., Brantley v. American Airlines Group, Inc.*, No. 16-3540, 2016 WL 6876345, at *4 (E.D. Pa. Nov. 22, 2016) (noting that negligent supervision and *respondeat superior* claims may be pled in the alternative); *Bayview Loan Servicing, LLC v. Law Firm Of Richard M. Squire & Associates, LLC*, No. 10-1451, 2010 WL 5122003, at *5–6 (E.D. Pa. Dec. 14, 2010) (allowing negligent supervision claim to survive a motion to dismiss as an alternative claim to direct/*respondeat superior* liability).

Ultimately, of course, Plaintiff cannot prevail on both his negligent supervision claim and his claims based on *respondeat superior* liability. Plaintiff concedes as much. See ECF No. 11 at 6 ("If Defendant Pacific Life admits in response to Plaintiff's pleading that Defendant Klein was acting within the scope of his agency with Pacific Life, then Plaintiff will agree that a claim for negligent supervision cannot be maintained."). At this stage in the litigation, however, it is entirely appropriate for Plaintiff to plead both claims in the alternative. It is recommended that Defendants' motion to dismiss Plaintiff's negligent supervision claim be denied.

E.    **Conclusion**

For the reasons set forth above, is respectfully recommended that the Motions to Dismiss filed by Pacific Life (ECF No. 5) and Klein (ECF No. 13) **be granted in part and denied in part**. It is recommended that Defendants' motions to dismiss be denied as to Plaintiff's claims for negligent misrepresentation (Count I), breach of fiduciary duty (Count IV), negligent supervision (Count V), and his claim pursuant to the UTPCPL (Count III). It is further recommended that Defendants' motions be granted with respect to Plaintiff's claim for fraudulent misrepresentation (Count II). Accordingly, it is recommended that Counts II of the Complaint be dismissed, with prejudice.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrate Judges, the parties are allowed fourteen (14) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.


Dated: August 4, 2017                                    BY THE COURT:

                                                         LISA PUPO LENIHAN
                                                         United States Magistrate Judge


cc:    All Counsel of Record
       *Via CM/ECF Electronic Mail*